

FEB 25 2009

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CHARLES ALFORD, III                    )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )      1:08cv595 (LMB/TRJ)
                                       )
MARTIN & GASS, INC., <u>et al.</u>,   )
                                       )
        Defendants.                    )

<u>MEMORANDUM OPINION</u>

On January 9, 2009, the Court held oral argument on the parties' cross motions for summary judgment.[1]  At the conclusion of the hearing the defendants' motions were granted.  This Memorandum Opinion supplements the oral ruling.

### I. BACKGROUND

**A. Alford's Employment with Martin & Gass and Assignment to Angler's Site.**

Plaintiff Charles Alford III ("Alford") is a 65-year-old African-American resident of the District of Columbia.  He was first employed by defendant Martin & Gass ("M&G") in 1995.  He left M&G in 2003, claiming that he heard that white workers with less experience were being paid more per hour than he was.

---

[1] Although the Clerk was directed to enter judgment in defendant Angler Construction Co.'s favor under Fed. R. Civ. P. 58, a final judgment was not entered as to defendant Martin & Gass, Inc. because some claims under the Fair Labor Standards Act were not addressed.  On February 2, 2009, the parties' motion to have a Rule 58 judgment entered was granted.

However, he returned to M&G in 2004 at a higher pay level.
Although he performed a variety of construction-related tasks,
Alford's typical job was to run and maintain a rock crusher that
M&G leased out to contractors.

Beginning in 2006 or 2007,[2] Alford periodically operated
M&G's crusher at a "recycling yard" on the site of co-defendant
Angler Construction Company ("Angler").[3]  Approximately 20 people
worked at the Angler yard at any given time.  Angler leased the
crusher from M&G on a regular basis, and M&G, as part of the
lease agreement, supplied an operator, Alford.  Alford was
responsible for operating the crusher and for keeping it in good
condition for M&G's benefit.  Angler employees were responsible
for related tasks such as loading the crusher, although Alford
would occasionally do these tasks if an Angler employee was not
present.  Alford asserts that he was the only full-time black
worker at the site, and that the only other black worker
occasionally at the site was M&G's fuel truck driver, Steve
Hoffman, who serviced and fueled the crusher.  M&G also rented
out the crusher to other clients and used it for its own jobs.

**B. Alleged Racist Incidents at the Angler Site.**

---

[2]Because the parties have used both 2006 and 2007 as the
start date, it is unclear exactly when Alford's work at the
Angler yard started.

[3]The crusher crushes rocks and concrete into smaller pieces,
and the "recycled" rock and concrete is used by Angler and sold
to others for road paving and other projects.

Alford alleges that he was subject to a series of racist incidents at the Angler site.[4]  According to Alford, Angler employees, including two individuals whom he describes as his supervisors,[5] Kenneth McDonald and Gordon Sutton, subjected him to a number of racist incidents, described in Alford's declaration and depositions as the following:

1) Many Angler employees, including McDonald and Sutton, "constantly made racial jokes."

2) Once when Alford was drinking a Dr. Pepper, McDonald stated that "black people like Dr. Pepper" or "you black people like Dr. Pepper."

3) Sutton asked him on several occasions, "How do you get into that black skin?  You're not black.  You're white."

---

[4]In his Complaint and declaration (Pl.'s Opp. to M&G Mot. S.J. Ex. 1), Alford also alleged racist incidents during his employment for M&G that did not involve Angler.  He alleged that in 2006, at a project in West Ox Road in Fairfax, an M&G employee made several offensive comments, including "The last time I killed a black man it felt so good," and "Blacks don't know anything."  Alford alleged that he reported the behavior to M&G's Superintendent, and the employee was terminated.  Alford also alleged that in early 2007, two M&G workers made racist remarks about blacks to him on a regular basis, physically assaulted him, and attempted to get him fired, and that after Alford reported the behavior to M&G's superintendent, no disciplinary action was taken.  However, none of these incidents were discussed either in Alford's opposition to summary judgment or at oral argument.  Therefore, it appears that Alford is not relying on these incidents for his claims against M&G.

[5]As discussed further infra, Angler denies that either of these men were Alford's supervisors, calling them "equipment operators" instead.

-3-

4) Sutton once used the "n" word in conversation with Alford; specifically, during a conversation about fireplaces, Sutton asked him, "Do n-----s have fireplaces and stuff like that?" Alford told him he did not want to hear him use the word again, and there are no allegations that the word was ever repeated.

5) In December 2007, Sutton ran around with a white bandana or "doo-rag" on his head with eyeholes cut out, as if it were a Ku Klux Klan hood.

6) In February or March of 2008,[6] when Alford tried to instruct a white Angler employee on the proper use of M&G's excavator, the worker "became angry and deliberately swung a large rock around with the machine in a threatening manner, nearly hitting Mr. Alford."

7) In the spring of 2008,[7] an Angler worker attached a large Confederate flag to his car and glared at Alford as he slowly drove by.

**C. Alford's Response to Alleged Racist Incidents.**

It is uncontested that Alford did not report any of these

---

[6]Although this time frame is alleged in the Complaint, it is unclear how this incident could have occurred any later than March 3, 2008, the date on which Alford, according to the undisputed evidence, left the Angler site permanently.

[7]Again, although this time frame is alleged, it is unclear how any relevant incidents could have happened any later than March 3, 2008.

-4-

activities to M&G, nor did he speak to Angler's president, Jack
Hazel, about them, even although Alford admits he was comfortable
talking to Hazel, whom Alford describes as "a very nice person to
[Alford]." According to Alford, in October 2007, he indicated to
Hazel that he wanted to talk with him about problems he was
having with an Angler employee. Alford did not identify the
employee or the nature of the problems. Hazel corroborates this,
saying that Alford told him he was "concerned that there was some
horseplay on the jobsite and . . . if he had an issue, could he
talk to me about it." Hazel testified that he asked Alford to be
specific but Alford did not specify the nature of the problem.
Alford testified that he never spoke to Hazel beyond this brief
conversation because both were busy, as Hazel was "in and out" of
the site constantly and Alford was "running the machine." Alford
asked for, and received, Hazel's cell phone number, but never
followed up to discuss any racist incidents. It is undisputed
that Alford never stated to Hazel, either expressly or impliedly,
that any of the alleged racist incidents described above had
occurred.

Alford asserts that although he was offended by the
incidents, he "tolerated the insults and did not report them
because [he] needed the job." He speculated that many of the
racial comments "could be joking around. Like they think the
jokes that they be telling is funny to them, but it wasn't for

-5-

me." He testified that he responded to the Dr. Pepper comment
with, "There you go with the racial stuff again," and that when
he heard other comments, he "would just walk off."

### D. Noose Incident of February 29, 2008.

The incident at the heart of this litigation occurred on
Friday, February 29, 2008, when Alford reported to the Angler
yard after having been off the project for a few weeks.  Shortly
after he arrived, he noticed a noose around a black sweatshirt
and pipe hanging from another piece of equipment.  The noose was
placed at a wood-processing station, about twenty feet from where
the crusher was positioned, and about five feet from where Alford
usually sat in his pickup truck while the crusher was operating.
To Alford, the figure looked like an effigy of a hanged black
man.  Hoffman, the black fuel truck driver for M&G, allegedly saw
the effigy as well, and told Alford, "I told you a long time ago,
they don't like you here."[8]

It is undisputed that the noose was hung by three white
Angler employees, Jeffrey "Craig" Lease, Earnest Lease (Jeffrey's
father), and Gary Wolfe, none of whom had any supervisory
authority over Alford.  Jeffrey Lease had previously been
involved in an altercation at work in January 2008 with another

---

[8]Although Alford alleges that Hoffman had warned him
previously that Angler workers did not want him on the project,
there is no affidavit, deposition testimony, or other direct
statement from Hoffman in the record.

-6-

white employee and had been suspended.  The three had put up the
noose one week earlier, when Alford was not working at the site,
and it hung there until Alford returned to the site on February
29.  Alford photographed the noose and reported it to McDonald,
who took it down within an hour.  Alford alleges that when he
told McDonald about the noose, McDonald said to him, "What's
going on?  I guess that you're going to get Al Sharpton and the
NAACP out here."[9]  Alford attempted to contact Sam Gass, M&G's
president, that day but was unable to reach him.  Alford worked
the rest of his shift on February 29.

On the morning of Monday, March 3, Alford reported the
incident to Gass and showed him the photographs of the noose.
According to Gass' testimony, Gass asked Alford if there had been
any previous racial incidents at Angler, and Alford responded
that "there'd been a lot of joking around going on . . . for
months."  According to Gass, when Gass asked Alford why he had
not reported anything, Alford responded that he "didn't feel like

---

[9]There is a conflict between Alford's deposition, taken on
October 24, 2008, in which he states that McDonald made the
"Sharpton" comment on Friday, February 29, and his declaration of
June 2, 2008, which states that McDonald made the comment on
Monday, March 3.  The Court finds that this discrepancy is not a
dispute of material fact that would preclude summary judgment on
any of the counts.  However, for the purposes of this opinion,
the Court finds Alford's deposition testimony more persuasive
than the declaration, particularly given that the declaration
includes numerous facts that are not mentioned at all in the
summary judgment brief.  The Court will therefore adopt the
February 29 date used by Alford in the deposition.

there was anything to report," that "[they] were all joking around," and that he "didn't feel like he was threatened."

Gass immediately called Hazel.  Hazel asserts, and Alford does not dispute, that this was the first Hazel heard of the noose or any other racial incidents directed at Alford.  Hazel immediately went to the yard and spoke to Alford and to the three employees who had put up the noose.  Hazel questioned the employees, verbally reprimanded them, and informed them that their behavior was inappropriate and that further such behavior would result in their termination.  Hazel also had Angler's safety officer, Richard Athey, question the three employees.

According to Athey, the employees told him that there was no racist intent and that the noose was not directed at Alford or at blacks.  Athey testified that the three employees all gave the same basic explanation:

> Craig [Jeffrey Lease] had been watching [the movie] Hang 'Em High.  He had also watched Wild West and it happened to be on hanging.  And that during lunchtime or what they call dinner, your noon meal, they were talking about it.  Because that's what they'd watched over . . . the weekend.  Talked about tying a hangman's noose.  Craig says I don't know how.  Gary says, you know, I think I know how.  He says, I think I remember how.  And so that's how it was done.  Craig put a piece of pipe in there and a piece that was laying on the ground, and put a cover over it and called it his horse or donkey Pedro or something like that.  It was an inappropriate joke between the 3 employees.

Athey Dep. 32:10-32:22.  Jeffrey Lease corroborated this account during his deposition.  He also said that it did not occur to him

-8-

that "colored people" would be offended by the noose - indeed, he testified that he did not even believe that the figure in the noose looked like a person - but that after he spoke with a sheriff investigating the incident, he understood why African-Americans might take offense.[10]  The three employees were not suspended for the incident; however, they were given "employee warning letters" notifying them that their conduct was inappropriate and that future inappropriate conduct would result in termination.  Athey asserts that he took notes while interviewing the employees, but lost the notes within a week.  As such, Angler was unable to produce Athey's notes for discovery.

After speaking to Alford and the employees on March 3, Hazel called an employee meeting and told Angler's employees at the yard that this conduct was unacceptable.  Earnest Lease went to Alford on behalf of the three employees and apologized.  Hazel spoke to Alford and told him that the situation was addressed and Alford would not have any more problems.  Hazel then called Gass and made the same representations.  Gass said that Hazel "assured [him] that the incident was horseplay" and that the individuals involved "had no intention or meant any direct type of harm . . .

---

[10]In the evening of March 3, 2008, Alford filed a report with the Prince William County Police, who contacted the Federal Bureau of Investigation.  Law enforcement authorities investigated the noose incident as a hate crime; however, there is no evidence in the record as to the results of the investigation, nor is there indication that charges were ever filed.

to Mr. Alford." Gass asked Alford if the situation was addressed to his satisfaction, and Alford replied that it was, and that he would go to work for the rest of the day. Gass did not inquire into exactly what Hazel had done to address the situation, but stated that based on Hazel's and Alford's representations, he was satisfied that the problem was resolved. At some point on March 3, Gass also spoke to Hoffman, who was the only other M&G employee at the Angler facility. Gass asserts that Hoffman said that he "didn't really pay any attention to" the noose and "didn't notice" it. Gass did not undertake any further investigation after he spoke to Alford and Alford told him he felt the issue had been addressed.

Alford alleges, however, that on the afternoon of March 3, when he returned to the Angler yard after his discussions with Hazel and Gass and after the employee meeting, other workers "walked by and glared angrily" at him, "looking like I did something terrible." Alford also asserts that one of the employees who was running a loader - possibly Gary Wolfe - "kept riding by" on the loader "in a threatening motion . . . swinging the machine back and forth, like it's going to hit my truck."[11]

---

[11]Alford testified during his deposition that before the noose incident, he had felt that a worker at Angler drove his vehicle too close to Alford's crusher. Alford said that he believed that these actions may have been intentional and motivated by race. Alford testified that he reported the truck incidents only to McDonald. Hazel, however, testified that Alford had told him about the truck incidents, but did not

-10-

Alford did not report any of the March 3 incidents[12] to Hazel or Gass.  He did, however, inform Gass that he felt uncomfortable at the Angler yard and did not want to continue working there.  At this point, the parties dispute Gass' reaction.  According to Alford, Gass told him that if he did not want to go back to work at the Angler site, he had no other work for Alford to do.  According to Gass, he told Alford he would try to reassign him to another job site if that was possible, but he was not sure what type of work that would be.[13]  Gass testified, and a "Payroll Change Notice" in evidence (M&G Mem. S.J. Ex. 5) corroborates, that M&G offered Alford a position operating a rubber tire loader, a position whose standard pay would represent a 30 percent pay cut, and Alford declined it.  Gass testified that although the tire loader position was less lucrative, it was the best position he could find for Alford, and that he attempted to

_____

indicate that he thought they were motivated by racial animosity; rather, he had raised it as a safety concern.  Hazel testified that he believed one of the workers was Gary Wolfe, that he spoke to Wolfe at the time, and told him to make sure to give Alford room.  Alford does not mention the truck incidents in his summary judgment opposition when describing the history of alleged racist incidents at Angler.

[12]As discussed supra, in his declaration, Alford also stated that McDonald's "Sharpton" comments occurred on March 3.  Regardless of when those comments occurred, Alford did not report them to Hazel or Gass.

[13]M&G owned only one crusher, which was at the Angler site; thus, Alford would not be able to operate the crusher if he refused to work at Angler.

-11-

accommodate Alford even though such accommodation would have required him to disrupt crews and move other employees to different locations.  Alford disputes that Gass ever offered him other jobs, but argues that in any event, a choice between remaining in a racially discriminatory environment at Angler and taking a 30 percent pay cut would have represented a "Hobson's choice."  On March 4, Gass called Alford and asked if he was coming back to work, and Alford said he was not.  Alford has not worked for M&G since.[14]

### E. The Complaint and Summary Judgment Motions.

Alford has sued both M&G and Angler for race-based discrimination, harassment/hostile work environment, and retaliation under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), which prohibits employment discrimination on the basis of race, and Section 1981 of the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981 ("§ 1981"), which prohibits racial discrimination in the making and enforcing of contracts.  Alford has also sued Angler for negligently retaining Jeffrey Lease after his suspension for fighting.  M&G and Angler have moved for summary judgment on all of the above claims.  Alford has filed

---

[14]M&G asserts that Gass told Alford that he could take four days of paid vacation to consider whether or not he wanted to return to the Angler site, that Alford did so, but then chose not to return.

-12-

cross motions for summary judgment against both defendants; his motion against M&G requests that M&G be barred from asserting certain affirmative defenses, and his motion against Angler asks for summary judgment or an adverse jury instruction because of Angler's alleged spoliation of evidence.  The Complaint also includes two Fair Labor Standards Act ("FLSA") claims against M&G and Samuel Gass for misclassification and collection of wages.  These claims were not at issue in the summary judgment motions.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when, on the basis of the pleadings and attached evidence, there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Evidence must be viewed in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The non-movant must set forth specific facts showing that there is a genuine issue for trial, and not rest on mere allegations. Fed. R. Civ. P. 56(e).  Evidence that is "merely colorable" or "not significantly probative" is insufficient to overcome a summary judgment motion.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

## III. DISCUSSION

### A. Claims against Martin & Gass.

-13-

Summary judgment in favor of M&G was granted because the evidence unequivocally establishes that M&G was unaware of any of the alleged racist conduct occurring at the Angler yard until after Alford reported the noose incident.  In addition, M&G, through Gass, responded quickly and appropriately once Alford told Gass about the noose incident, and there is no evidence supporting Alford's claim of retaliation.

### 1. Discrimination and Hostile Work Environment.

The claims in Count I (discrimination) and Count II (harassment/hostile work environment) are essentially the same, as both allege racially harassing conduct at the Angler site. Thus, the standard for evaluating the two counts is the same.  To make a prima facie claim for a hostile work environment, a plaintiff must show (1) unwelcome conduct or harassment (2) based on race, gender, or other protected characteristic (3) sufficiently severe and pervasive so as to alter the conditions of employment and create a hostile work environment, and (4) some basis for imputing liability to the employer.  Smith v. First Union Nat'l Bank, 202 F.3d 234, 241 (4th Cir. 2000).

As the evidence clearly establishes, all of the racist comments and behavior occurred at the Angler site, by Angler employees.  Assuming, arguendo, that the conduct in question meets the first three elements above, Alford must still show a basis for imputing liability to M&G.  The parties dispute the

-14-

standard for imputing liability.  M&G argues that the Court should hold it liable "only if it knew or should have known about the harassment and failed to take effective action to stop it . . . [by] respond[ing] with remedial action reasonably calculated to end the harassment."  EEOC v. Sunbelt Rentals, 521 F.3d 306, 319 (4th Cir. 2008) (internal quotation marks and citations omitted).  Conversely, Alford urges the Court to hold M&G strictly liable for the harassment unless it can establish an affirmative defense that (1) it exercised reasonable care to prevent and promptly correct harassing behavior, and (2) Alford unreasonably failed to take advantage of any preventive or corrective opportunities or otherwise to avoid harm.  See Mikels v. City of Durham, 183 F.3d 323, 332 (4th Cir. 1999), citing Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Burlington Indus. v. Ellerth, 524 U.S. 742 (1998).

The appropriate standard to be applied is the one proposed by M&G.  This standard is typically applied to employers for harassment committed by the victim's non-supervisory co-workers.  See Howard v. Winter, 446 F.3d 559, 565 (4th Cir. 2006).  It has also been extended by some courts to the acts of non-employees over whom the employer exercises some control.[15]  Conversely, the

_____

[15]See Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1074 (10th Cir. 1998) (holding that a restaurant is liable for harassment by customers if the restaurant "fail[s] to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have

-15-

standard suggested by Alford, which contains a presumption of vicarious liability (the "Faragher/Ellerth" standard) applies only to discrimination by the victim's supervisors, and only when the discrimination is "aided by the agency relation" between the supervisors and the employer. Mikels, 183 F.3d at 331. Alford has alleged two categories of discrimination, the noose incident and prior incidents at Angler. It is undisputed that the noose incident was perpetrated by non-supervisory co-workers of Alford; thus, M&G's proposed standard, not Faragher/Ellerth, clearly applies to that incident. Regarding the prior incidents, there is a dispute as to whether McDonald and Sutton, the alleged perpetrators, were Alford's "supervisors" at Angler. The Court has resolved this question in the negative for reasons that are discussed infra in Part III.B; thus, M&G's proposed standard applies to the prior incidents as well. However, even if McDonald and Sutton could be considered Alford's supervisors because they had authority over Angler's yard, the Faragher/Ellerth vicarious liability presumption, which is based on agency principles, would still not apply to M&G because McDonald and Sutton were not agents of M&G. Therefore, their harassment of Alford could not have been "aided by [an] agency

---

known"); Crist v. Focus Homes, Inc., 122 F.3d 1107, 1108 (8th Cir. 1997) (holding that a nursing home could be held liable for harassment by a resident when it knew of the conduct and failed to respond appropriately).

relation" with M&G, and M&G cannot be held presumptively liable for their actions.  Faragher/Ellerth is thus inapplicable to any of Alford's claims against M&G.  Instead, M&G can only be liable for harassment by Angler's employees if it knew or should have known of the conduct and failed to take appropriate remedial action.

On this record, it is clear that M&G is not liable for the incidents at Angler before the noose-hanging, because there is not a scintilla of evidence that M&G was on notice about any such incidents.  Alford admits that he never reported any of those incidents to M&G.  The first hint of any problem was on March 3, 2008, when Alford, while reporting the noose incident to Gass, alluded to the past incidents, stating only that "there'd been a lot of joking around going on . . . for months," that he did not report it because he "didn't feel like there was anything to report," and that he "didn't feel like he was threatened" by those incidents.  Nowhere does Alford allege that he reported any of the details of the prior incidents to Gass, or that Gass should have taken action in response.  Thus, there is no basis for imputing liability for the prior incidents to M&G.[16]

Regarding the noose incident, accepting that this incident, by itself, could constitute severe and pervasive conduct because

---

[16]Indeed, Alford appears to concedes that M&G is not liable for the prior incidents, as his opposition to M&G's summary judgment motion focuses almost entirely on the noose incident.

-17-

of the deeply hurtful meaning of a noose to African-Americans, M&G is still not liable because it took appropriate remedial action once put on notice.  Gass, M&G's president, immediately called Hazel, Angler's president.  Hazel then investigated the incident personally and spoke to the employees.  By this time, the noose itself had already been removed.  Hazel then promptly reported back to Gass, telling him that he had investigated the incident, determined it was not race-motivated, and believed that it was resolved.  Gass then spoke to Alford again, and Alford said he would go back to work.

Alford argues that M&G's actions in response to the noose incident were insufficient and that Gass "abjectly forsook any responsibility" when he accepted Hazel's statements at face value, did not conduct his own investigation, and did not verify that remedial measures were implemented or that discipline was meted out.  However, the Fourth Circuit does "not require[] that particular remedial responses be the most certainly effective that could be devised."  Mikels, 183 F.3d at 330.  This Court does not find that M&G's response was inadequate.  Gass and Hazel obviously had a long-standing business relationship.  There is no evidence in the record that would have caused Gass to believe that Hazel - who himself went promptly to the yard, spoke to the employees and Alford, and reprimanded the employees - was being disingenuous.  Moreover, Alford told Gass he was satisfied.  On

these facts, nothing indicated to Gass that he needed to undertake his own investigation. Because M&G took prompt remedial action reasonably calculated to end the harassment, the conduct of Angler's employees cannot be imputed to M&G, and Alford's discrimination and hostile work environment claims against M&G fail.

### 2. Retaliation.

Alford also claims that M&G retaliated against him. To prevail, Alford must prove that he engaged in a protected activity, and that M&G took an adverse action against him because of the protected activity. Spriggs v. Diamond Auto Glass, 242 F.3d 179, 190 (4th Cir. 2001). Alford engaged in a protected activity when he reported the noose to Gass. However, he cannot show that M&G retaliated against him in response.

Alford first alleges that M&G retaliated against him by failing to address the harassment on the Angler worksite. This allegation does not state an actionable retaliation claim, because it alleges no adverse action by M&G that was caused by Alford's complaint. Rather, any failure by M&G to properly address the offensive conduct is an element of Alford's hostile work environment claim, as described at length above. Moreover, even if this were an actionable retaliation claim, the evidence shows that M&G took reasonable action to address the harassment, as described supra.

-19-

Alford next argues that M&G retaliated against him by not finding him work at a location other than the Angler site.  M&G has offered an affidavit and deposition testimony by Gass, as well a Payroll Change Notice (M&G Mem. S.J. Ex. 5), as evidence that M&G offered Alford a chance to work as a rubber tire loader operator – an alternative, albeit lower-paying, position.  Alford contends that Gass never offered him another opportunity. Whether or not Alford was offered another job, there are no facts in evidence that support a conclusion that M&G's actions were retaliatory.  Alford was a crusher operator.  M&G owned only one crusher, which was assigned to Angler.  Short of pulling the crusher from the Angler job (and possibly exposing itself to liability for breach of contract), M&G could not have found Alford a job operating the crusher.  Furthermore, Gass's testimony that he did not have any other crusher work for Alford at the time is undisputed.  In short, other than pure speculation, there is no evidence that M&G's failure to reassign Alford to another crusher job elsewhere was retaliatory.

Finally, Alford alleges that by not reassigning him, M&G retaliated by constructively discharging him.  This claim fails as well.  Constructive discharge requires that an employer deliberately make an employee's working conditions intolerable in an effort to induce him to quit.  <u>Matvia v. Bald Head Island Management, Inc.</u>, 259 F.3d 261, 272 (4th Cir. 2001).  Even if

-20-

Alford could establish that his working conditions were intolerable, there are no facts in evidence that support any deliberate efforts by M&G to force him to quit.

For these reasons, summary judgment was granted to M&G on both the Title VII and § 1981 claims,[17] and Alford's cross-motion for summary judgment was denied.[18]

## B. Claims Against Angler.

Summary judgment was granted to Angler on the Title VII and § 1981 claims of discrimination and retaliation because Angler was not Alford's employer and did not have a contractual relationship with him, and took appropriate remedial measures once it was notified of the harassing conduct. Moreover, there is no evidence in this record that Angler retaliated against Alford. Summary judgment was also granted to Angler on Alford's negligent retention claim because Jeffrey Lease's participation in the noose-hanging was not a foreseeable result of Angler's retention of him following a fight with another white employee.

### 1. Title VII and § 1981 Claims.

---

[17]Title VII and § 1981 claims require the same essential elements, both for hostile work environment claims, see Spriggs, 242 F.3d at 183-84, and for retaliation claims, see Bryant v. Aiken Regional Medical Centers Inc., 333 F.3d 536, 543 (4th Cir. 2003). Thus, both fail as a matter of law.

[18]In Alford's motion, he seeks to bar M&G from asserting the Faragher/Ellerth affirmative defenses. Because, as described above, the Faragher/Ellerth standard is inapplicable to M&G, Alford's motion for summary judgment has been denied.

-21-

### i. Whether Angler was Alford's Employer.

For Angler to be liable to Alford under Title VII, Angler must have been Alford's employer. See Farlow v. Wachovia Bank of North Carolina, N.A., 259 F.3d 309, 313 (4th Cir. 2001). Whether a relationship is an employer-employee relationship or an independent contractor relationship depends on whether the alleged employer has the "right to control the manner and means by which the product is accomplished." Id. The factors relevant to this inquiry include:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

Id. The parties' beliefs regarding the nature of the employment relationship are also significant. Id. A party may, for Title VII purposes, have more than one employer at a time, and two or more companies can jointly employ an employee. See Magnuson v. Peak Tech. Servs., Inc., 808 F. Supp. 500, 507 (E.D. Va. 1992).

Under this standard,[19] Angler was not Alford's employer for Title VII purposes. Alford was paid by M&G, was M&G's employee

---

[19]Tellingly, Alford's opposition to summary judgment cites non-binding case law from other jurisdictions, rather than the Fourth Circuit standard from Farlow.

-22-

for tax purposes, and received no benefits from Angler.  Alford
also was not located at Angler full-time; although he was at
Angler's yards on a regular basis, his work at the Angler site
was not an exclusive relationship and he traveled with the
crusher to other sites as well.  His only duty at Angler was to
operate M&G's crusher,[20] and, as M&G's employee, he was the only
individual authorized to operate the crusher.[21]  He would
occasionally direct Angler employees loading the crusher to
ensure they would load the crusher in a way that would not damage
it.  This, however, does not establish any employer-employee
relationship between Angler and Alford; if anything, it shows
that Alford had a degree of independence from Angler because of
his responsibility to safeguard M&G's equipment.

In addition, Angler had no authority whatsoever to fire,
promote, demote, reassign, or discipline Alford, or to change his
job duties.  Presumably, Angler could have reported Alford to M&G

---

[20]Although Alford asserts that he would occasionally fill in
for Angler employees doing other jobs, the evidence shows that
these other jobs - loading the crusher, and operating a hoe that
fed the crusher - directly revolved around the crusher.
Furthermore, Alford testified that he did these other jobs
because his employer, M&G, did not like down time - not because
of any duty he owed to Angler.

[21]Although Alford points to an excerpt from Sutton's
deposition stating that Alford would sometimes sit in his truck
during lunch while Angler employees worked with the crusher, the
deposition shows that the Angler employees loaded the crusher,
using a different tool called an excavator.  Alford was the sole
individual who operated the crusher, which he did using a
computer, sometimes remotely from his truck.

had his performance been unacceptable, but if this were
sufficient to create an employer-employee relationship, then any
worker in a contracting situation would be an employee.  Angler
did not consider Alford to be their employee; they rented the
crusher from M&G, and Alford came with it.  M&G could have
supplied a different crusher operator if it chose to do so.

Alford also asserts that Angler was his employer because of
Gass' testimony that Alford was expected to follow the
instructions of supervisors at the Angler yard, and Alford's
testimony that McDonald, an Angler employee, directed him as to
what work he would do on any given day.  However, Alford's
deposition shows that any control exercised by Angler over him
was minimal, and that Angler's instructions were limited to (1)
what stone Angler wanted him to crush, (2) what size stone to
produce, and (3) where on the yard to position the crusher:

> Q. And Angler directed you in that work by saying,
> "Here is the pile we want you to crush," correct?
> A. Correct.
> Q. And Angler directed you by telling you, "This is the
> size of rock we want to come out at the end," correct?
> A. Correct.
> Q. All right.  And other than that, did Angler direct
> you in your work in any fashion at all?
> A. No; only in going to one place to another.
> Q. Right.  Where to be.
> A. Yeah, where to be.

Alford Dep. 104:16-105:4.  Angler's instructions to Alford,
therefore, amount to the mere assignment of work, which is
insufficient to create an employer-employee relationship.  See

-24-

West v. MCI Worldcom, Inc., 205 F.Supp.2d 531, 540 (E.D. Va.
2002) ("The fact that [supervisors] assigned [an employee] the
work in the first place is more akin to the administrative
oversight that courts find does not qualify as control.")

Because there was no employer-employee relationship between
Angler and Alford, all of the Title VII claims against Angler
fail.  For the same reason, Alford's § 1981 claims against Angler
fail because Alford did not have any contractual relationship
with Angler, but only with M&G.[22]

### ii. Other Reasons Alford's Discrimination Claims Fail.

Even if Angler were considered Alford's employer, his Title
VII and § 1981 claims still fail for independent reasons
articulated below.

### a. Discrimination/Hostile Work Environment: Noose incident.

As articulated supra, an employer is only liable for
discriminatory harassment by non-supervisory employees if it
fails to take effective action to stop the harassment once it has
actual or constructive knowledge of it.  See Sunbelt Rentals, 521
F.3d at 319.  The noose incident was perpetrated by Alford's co-
workers, not his supervisors; thus, this standard applies.

---

[22]An at-will employment relationship constitutes a contract
for § 1981 purposes, see Spriggs, 165 F.3d at 1018-19; however,
this relationship must still be between the plaintiff and the
defendant, which it was not in this case.

-25-

The evidence in the record clearly establishes that Angler responded reasonably to the noose incident. This was the first incident of racial harassment Alford reported to Angler, and Angler immediately responded by having the noose removed. Hazel personally went to the yard and interviewed the employees on the same day he learned of the noose incident. Athey also interviewed those responsible and each was reprimanded and given both oral and written warnings that future inappropriate conduct would result in termination. Hazel also called a meeting of all employees in the yard and told them this sort of conduct was unacceptable. Angler took actions similar to those found by circuit courts to be sufficient under similar or worse circumstances. See Williams v. Waste Mgt. of Ill., Inc., 361 F.3d 1021 (7th Cir. 2004) (finding an employer not liable after it provided verbal warnings threatening termination to employees who told a black man he looked like a gorilla, used the n-word, and placed an extension cord tied as a noose on his workbench); Hollins v. Delta Airlines, 238 F.3d 1255 (10th Cir. 2001) (finding an employer not liable for a noose-hanging and a joke about hanging another employee, where the employees involved were reprimanded and the nooses were removed). The reasonableness of Angler's response is also enhanced by the absence of any history of racial animosity between Alford and the three employees (Alford admitted he did not even know their names) and the fact

-26-

that the noose was hung during a time period when Alford was not
even at the yard.

Finally, Alford's motion for summary judgment, in which he
asks for judgment against Angler, or alternatively an adverse
jury instruction for spoliation of evidence, is unavailing.  This
motion is based on Athey's loss of the notes that he took during
his investigation, and is premised on the possibility that the
notes contained evidence that would be adverse to Angler - for
example, that they would have shown that the noose incident was
truly race-motivated, although Athey and Hazel concluded it was
not.  Alford's motion was denied because even assuming that the
noose incident was race-motivated, Angler's response of issuing a
harsh reprimand was an adequate response as a matter of law for
the reasons described above, and therefore, any possible
spoliation of evidence was immaterial to the outcome of Angler's
summary judgment motion.

### b. Discrimination/Hostile Work Environment: Prior Incidents.

Angler is also not liable for any of the alleged
discriminatory incidents that occurred before the noose incident.
Under the standard applicable to harassing conduct by co-workers,
see Sunbelt Rentals, 521 F.3d at 319, Angler is clearly not
liable as Alford never reported any of these incidents.  Alford,
however, alleges that the perpetrators of the offensive conduct -
McDonald and Sutton - were his supervisors, and therefore that

-27-

Angler is strictly liable for their harassment, subject to two potential affirmative defenses, under the Faragher/Ellerth standard.[23]  Alford's claim, however, fails because McDonald and Sutton were not his supervisors.

Although Alford has stated that he viewed them as in charge of the yard, and in particular viewed McDonald as the foreman, Sutton's testimony was that neither he nor McDonald had formal titles as foremen; rather, the two took it upon themselves to establish an informal hierarchy.  In any event, whether or not they supervised other Angler employees, McDonald and Sutton clearly had no supervisory authority over Alford.  Neither one had authority to take any tangible employment actions against him.  At most, by telling him what stones to crush, McDonald had "occasional authority to direct [Alford's] operational conduct." Mikels, 183 F.3d at 334.  This limited authority is not sufficient to make McDonald and Sutton's alleged harassment "aided by the agency relation" with Angler or to make Alford "vulnerable to and defenseless against the . . . conduct in ways that comparable conduct by a mere co-worker would not." Id. at

---

[23]As explained supra in Part III.A, under the Faragher/Ellerth standard, an employer is liable for harassment by a supervisor unless it can establish an affirmative defense that (1) it exercised reasonable care to prevent and promptly correct harassing behavior, and (2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities or otherwise to avoid harm.  See Mikels, 183 F.3d at 332, citing Faragher 524 U.S. at 775, and Ellerth, 524 U.S. at 742.

333.  Rather, the "authority possessed [by McDonald and Sutton over Alford] was at best minimal." Id. at 334.  Thus, for Title VII purposes, they were Alford's co-workers, not his supervisors. As a result, because Alford never reported their conduct, their conduct cannot be imputed to Angler, and Alford's claims fail.[24]

Finally, even if the prior incidents were imputable to Angler (and if Angler were considered Alford's employer), most of the prior incidents were not severe and pervasive.  To meet this standard, Alford must show that the conduct was sufficient "to alter the conditions of [his] employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted).  Most of the prior incidents, while offensive, did not meet this standard, but were in the nature of "[s]imple teasing, offhand comments, and isolated incidents," Faragher, 524 U.S. at 788, that do not meet the "severe and pervasive" requirement. Indeed, Alford himself testified that he did not feel threatened by the incidents, although he clearly was offended by them.  The

---

[24]Even if McDonald and Sutton were Alford's supervisors, Angler could establish a Faragher/Ellerth affirmative defense. Angler had an anti-harassment policy, which strongly militates in favor of concluding that it exercised reasonable care to prevent and protect harassment.  See Brown v. Perry, 184 F.3d, 388, 396 (4th Cir. 1999).  In addition, Alford failed to inform Hazel of any of the alleged conduct prior to the noose incident despite being comfortable talking to Hazel.  Under these circumstances, Alford's failure to report the offending conduct was unreasonable.

only possible exception is the "Klan hood" incident, which on its own could arguably constitute severe and pervasive conduct. However, given the numerous independent reasons articulated above for dismissing Alford's discrimination claims against Angler, it is unnecessary to resolve this issue.

### c. Retaliation.

Angler also did not retaliate against Alford for his complaint about the noose. To prevail on this claim, Alford must prove that he took a protected action, and that Angler took an adverse action against him because of the protected action. Spriggs, 242 F.3d at 190. The adverse action taken by Angler must have been "materially adverse;" that is, it must be the type of action that might "dissuade[] a reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67-68 (2006).

The only incidents Alford alleges occurred after his reporting of the noose incident were the uncomfortable glaring, the loader incident, and possibly the "Sharpton" comments. None of these de minimis actions by non-supervisory employees constitutes a "materially adverse" action by Angler as an employer. In addition, these minor actions are far outweighed by the reasonable steps Angler took to address the harassment. Thus, summary judgment has been granted to Angler on Alford's retaliation claim as well.

### 2. Negligent Retention.

Angler was granted summary judgment on Alford's negligent retention claim. Under Virginia law, an employer "is subject to liability of harm resulting from the employer's negligence in retaining a dangerous employee who the employer knew or should have known was dangerous and likely to harm others." Southeast Apts. Mgmt., Inc. v. Jackman, 513 S.E.2d 395, 397 (Va. 1999). Assuming that a noose-hanging can constitute the "harm" necessary to trigger a negligent retention claim under Virginia law,[25] the negligent retention claim here fails because the harm caused by Lease was not a foreseeable result of Angler's decision to retain him.

The harm suffered as a result of a negligent retention of an employee must be a foreseeable result of the retention. See Crump v. Morris, 2007 WL 6002110, at *4 (Va. Cir. Ct. Mar. 12, 2007). That is, to hold the employer liable, there must be some relationship between the employee's dangerous propensities that were known to the employer and the harm that the employee ultimately caused. Here, Angler retained Jeffrey Lease after he

---

[25] Compare Parker v. Geneva Enters., Inc., 997 F.Supp. 706, 714 (E.D. Va. 1997) (holding that negligently hiring or retaining an employee who discriminates based on race or gender, but who does not cause physical harm, is not actionable) with Sutphin v. United Am. Ins. Co., 154 F. Supp. 2d 907, 908 (W.D. Va. 2001) (holding that negligent retention requires only that the retained employee commit a "cognizable wrong" against the plaintiff and suggesting that Title VII discrimination could constitute a cognizable wrong).

engaged in an altercation with another white employee.  This
altercation in no way put Angler on notice that Lease might
engage in a racially discriminatory act such as a noose-hanging.
Even if Angler did not exercise due care in retaining Lease, any
harm to Alford as a result of Lease's subsequent actions was not
foreseeable.  Summary judgment has therefore been granted to
Angler on this claim as well.

### IV. CONCLUSION

For the above reasons, both defendants' summary judgment
motions have been granted on all counts, and plaintiff's two
summary judgment motions have been denied.  The only remaining
claims for trial are Alford's FLSA claims against M&G and Gass.

Entered this _25th_ day of February, 2009.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

-32-